# In the United States Court of Federal Claims

No. 19-1752
(Filed: March 11, 2025)

```
*************************************
THE CENTECH GROUP, INC.,           *
                                   *
              Plaintiff,           *
                                   *
       v.                          *
                                   *
THE UNITED STATES,                 *
                                   *
              Defendant.           *
*************************************
```

*Kenneth A. Martin*, The Martin Law Firm, PLLC, McLean, VA, counsel for Plaintiff. With whom were *James C. Fontana* and *L. James D'Agostino*, Fontana Law Group, PLLC, McLean, VA, of counsel. Also with whom were *David R. Warner* and *Heather B. Mims*, Warner PLLC, Reston, VA, of counsel.

*Amanda L. Tantum*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Michael J. Farr*, Senior Trial Attorney, Air Force Commercial Litigation Field Support Center, Joint Base Andrews, MD, of counsel.

## OPINION AND ORDER

**DIETZ, Judge.**

THE CENTECH GROUP, INC. ("CENTECH"), suing on behalf of its subcontractor Iron Bow Technologies, LLC ("Iron Bow"), seeks damages for breach of contract under the Contract Disputes Act, 41 U.S.C. § 7104(b)(1) ("CDA"). CENTECH claims that the United States Air Force ("USAF") improperly cancelled the installation of communications infrastructure in a building on Vandenberg Air Force Base ("VAFB") and refused to accept delivery of certain materials after approving them for purchase. CENTECH also claims that it is entitled to the reimbursement of attorneys' fees as contract administration costs under Federal Acquisition Regulation ("FAR") 31.205-33. Before the Court are the parties' cross-motions for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). For the reasons set forth below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** CENTECH's motion and **DENIES** the government's motion.

## I.    BACKGROUND

CENTECH is "an experienced government contractor that provides a full range of information technology, systems solutions and other related services to the federal government." Sec. Am. Compl. [ECF 94] ¶ 2. On December 14, 2016, the USAF awarded CENTECH a task

order under its NETCENTS-2 Contract No. FA8732-14-D-0010.[1] [ECF 94-1] at 2, 23, 47.[2] The task order was issued "in accordance with and subject to [the] terms and conditions" of the contract. *Id.* at 2. Under the task order, CENTECH was required "to complete the design, acquisition, and installation of the communications infrastructure supporting the renovation of [Building 7000] on [VAFB]." *Id.* at 42. This involved "installation of . . . communication and related equipment," including "[a]ll voice, data, audio, and video wiring within the building (in walls, below floors, and above ceilings) required to meet the Government approved final designs." *Id.* The task order required CENTECH to "[p]roduce the final designs/drawings/architectures to include an updated [Bill of Materials ("BOM")] for each of the task areas." *Id.* at 43. It instructed that "[f]inal designs and BOMs should be provided in a phased approach that supports the completion of [the] project in an efficient manner (i.e. designs and BOMs for each project task area may be completed/delivered at different milestones over the life of the project)." *Id.* CENTECH was required to "[p]rovide flexibility to adapt to contingencies resulting from [Building 7000] renovation schedule changes if required." *Id.* The building was planned to serve as "the future facility for United States Strategic Command's [] Joint Space Operations Center." *Id.* at 42.

The task order's objectives were "to allow [CENTECH] the maximum flexibility to innovatively manage the program schedule, performance, risks, warranties, subcontracts, and data to produce an [end item] that satisfies the user's performance requirements" and "to maintain clear Government visibility into the program schedule, performance, and risk." [ECF 94-1] at 44 (second alteration in original). Regarding the acquisition of materials and products, the task order required that CENTECH, "[u]sing a just-in-time approach based on the Government provided schedule and after approval from the government, obtain and manage logistics for all products and associated peripheral equipment required to successfully implement all approved designs." *Id.* at 43. It further stated that "[a] Government facility will not be provided if delivery cannot be made directly to building 7000; however, space for contractor's storage containers will be available." *Id.*

Under Contract Line Item ("CLIN") 0090, CENTECH could seek payment for "reimbursable materials and equipment." [ECF 94-1] at 14. It provided:

> This CLIN will be utilized to bill for reimbursable materials and equipment for the Activation of Bldg. 7000 to include GSA fleet or other vehicle(s) leases; no fee is authorized. Costs will be identified and approved as referenced in the [Performance Work Statement ("PWS")]. Contractor allowed to receive invoice payments for discrete portions of work, including partial deliveries, as soon as

---

[1] The "NETCENTS-2" or "Network-Centric Solutions 2" contract vehicle "provide[s] the Air Force with a primary source of netcentric and IT products, services, and solutions." Air Force NETCENTS, https://www.netcents.af.mil/ (last visited on Mar. 7, 2025).

[2] All page numbers in the parties' filings refer to the page numbers generated by the Case Management/Electronic Case Files ("CM/ECF") system.

completed and found acceptable by the Government (per FAR 32.102(d) and 32.906(c)).

*Id.* The PWS stated: "Reimbursable CLINs will apply for materials required to be purchased by the contractor with approval of the government in support of requirements within this PWS." *Id.* at 37.

On August 23, 2017, CENTECH subcontracted a portion of the work, including the purchase of certain materials, to Iron Bow. [ECF 94] ¶ 8; [ECF 94-1] at 51-53. Thereafter, on November 30, 2017, the USAF Program Manager ("PM") emailed the USAF Contracting Officer ("CO") the following: "My team is good with the attached BOM for Phase 1 of the Building 7000 Activation project. Recommend we notify CENTECH to proceed with the procurement of these materials, in accordance with the required processes, as soon as possible." [94-1] at 92; Pl.'s Mot. Summ. J. [ECF 102-1] at 163. Attached to the email was a memorandum signed by the PM stating:

1. The 614 ACOMS technical team and the B7000 Consolidation PMO Communications Lead have reviewed CENTECH's proposed Phase 1 Bill of Materials (BOM) "B7000 Phase 1 - BOM.xlsx" for the Building 7000 Activation. The BOM meets the government's technical requirements for Phase 1.

2. Recommend [CO] approve CENTECH to   proceed with acquisition of materials for Phase 1.

[ECF 94-1] at 98. Later that day, the CO emailed CENTECH to advise that the "BOM ha[d] been reviewed and [wa]s approved for the purchase of materials for Phase I." *Id.* at 92. On December 14, 2017, CENTECH notified Iron Bow that the USAF had provided CENTECH with "the authority to move forward . . . to purchase the items in [the] Phase I BOM totaling $2,074,303.31." *Id.* at 100. The same day, Iron Bow issued a purchase order to its supplier, Communications Supply Corporation ("CSC"), for the materials. *Id.* at 105. By January 8, 2018, Iron Bow had shipped a small number of the Phase 1 BOM materials to VAFB and invoiced CENTECH; the materials were stored in containers adjacent to Building 7000. [ECF 94] ¶18; Def.'s Mot. Summ. J. [ECF 103] at 14; [ECF 103-2] at 70.

On January 12, 2018, the PM emailed CENTECH that "[t]he Phase 1 design that the government approved purchasing materials for should accommodate a number of different modernized design courses of action," [ECF 102-1] at 177, and that "[i]deally, the government can get the Phase 1 labor estimate to look at and review separately from the discussion of what the different options for the Phase 2 could be," *id.* at 176.[3] He further explained that "[o]nce the Phase 1 labor is approved, then we can have a discussion on what different modernized design

---

[3] Phase 1 involved the acquisition and installation of the materials required to build the infrastructure in Building 7000. PM 1/14/2022 Depo. Tr. [ECF 102-1] at 37. Phase 2 involved acquisition and installation of the devices that would plug into the infrastructure. *Id.* at 38-39.

options for Phase 2 could look like." *Id.* On January 17, 2018, the USAF authorized CENTECH to proceed with installation of certain materials. *Id.* at 175. Shortly thereafter, on January 23, 2018, CENTECH emailed the CO and PM a labor worksheet with estimated labor costs for installation of the Phase 1 BOM materials. [ECF 94-1] at 112-17. The next day, January 24, 2018, the CO replied in pertinent part: "After looking at this breakout of hours and cost it appears that there may be a disconnect between what was approved on the BOM and the install regarding the BOM. I would ask that install does not begin or is placed on hold until this can be worked out." *Id.* at 112.

By late March 2018, the remaining BOM materials had been manufactured and were being stored in warehouses awaiting delivery instructions. [ECF 103-2] at 69-70. However, on April 12, 2018, CENTECH sent a letter to Iron Bow stating that "support of Iron Bow on Activation of Building 7000 at [VAFB was] no longer viable." *Id.* at 119. CENTECH explained that "[a]s assessed by the [USAF], continued miscommunication and the apparent lack of adaptability and flexibility with the Modernization design have caused grave concern by the Government, significantly delaying the progress of the Building." *Id.* CENTECH further stated that, while it and the USAF were "committed to keeping Iron Bow on the [Operations & Maintenance] component of the Task Order," CENTECH would search for a new subcontractor. *Id.* CENTECH concluded by requesting that Iron Bow "provide CENTECH authorized outstanding items that [were] monetarily owed to Iron Bow so CENTECH [could] address these items with the Government." *Id.*

On April 18, 2018, Iron Bow billed CENTECH $1,933,533.11 for the Phase 1 BOM materials. [ECF 103-2] at 126-27. Thereafter, on May 21, 2018, CENTECH emailed the CO and PM a copy of the invoice. [ECF 102-1] at 207, 212-13. In the accompanying email, CENTECH noted that the invoice, which was for $2,009,015.44,[4] had "not been submitted to iRAPT (formerly [Wide Area Work Flow ("WAWF")])." *Id.* at 207. CENTECH also included a cover letter from its CEO and President. *Id.* The letter stated:

> Due to the demand by senior management of Iron Bow . . . CENTECH is hereby responding to Iron Bow's demand of submitting the Iron Bow invoice for the materials (BOM) for the Vandenberg Building 7000 project. Invoice is attached.
>
> In consideration of the discussion between the [USAF] and CENTECH representatives on the Air Force['s] request to remove Iron Bow from the Building 7000 project, CENTECH management complied in supporting the Air Force to update the requirement [Request for Proposal ("RFP")] document for Building 7000 and with concurrence from the Air Force, Leidos has been invited to respond to the revised/updated RFP for the Building 7000 installation project.

---

[4] CENTECH arrived at the amount of $2,009,015.44 by adding 3.17% ($61,293) for "Sub/Material Handling" and 23.15% ($14,189.33) for "General and Admin" to Iron Bow's costs ($1,933,533.11). [ECF 103-2] at 135-37.

> In good faith, CENTECH is complying with Iron Bow's request for the Air Force to pay the invoice. CENTECH acknowledges concerns of the Air Force with Iron Bow's judgement on the Building 7000 project. As previously discussed, we urge the Air Force to consider the use of the materials covered by the invoice, based on the appropriate revised design.

*Id.*

In response to CENTECH's May 21, 2018, email, the CO sent a memorandum to CENTECH on June 1, 2018. [ECF 102-1] at 236. It stated:

> 1.    In response to the letter and attachments received from CENTECH dated 21 May 18, the Government requests that CENTECH cancel the order with [CSC] effective today 01 Jun 2018, as it has become evident the material does not meet the Government's requirements. Additionally, per FAR clause 52.245-1(e)(3)(i) Title to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under this contract shall pass to and vest in the Government upon the vendor's delivery of such property. The materials not delivered to the Government cannot be reimbursed. However[,] the delivered shipment of materials for $140,770.20 can be invoiced and reimbursed.

> 2.    In light of the circumstances regarding Iron Bow and the new subcontractor coming aboard[,] it is recommended that CENTECH work with the manufacturer to return items to stock, negotiate restocking fee's and/or replace material that fits within the design specifications for Bldg 7000. If there are items that can be utilized for the Bldg 7000 project on this task order[, USAF] request[s] CENTECH provide a list to the Government for approval prior to shipment.

*Id.*

On June 13, 2018, CENTECH emailed Iron Bow, advising that once the RFP had been issued to the new subcontractor, CENTECH would "solicit help from both Iron Bow and the new subcontractor to proceed with assessing the existing BOM." [ECF 103-2] at 147. CENTECH further stated that "[d]etails on how to proceed with the assessment of the BOM ha[d] yet to be 'definitized.'" *Id.* at 147-48. Having not received payment or disposition instructions for the BOM materials, on July 9, 2018, Iron Bow sent a letter to CENTECH demanding that it "take and pay for the outstanding products ordered by Iron Bow on CENTECH's behalf and pay any restocking fees that the manufacturer imposes for any products that can be returned." *Id.* at 240-

42. The letter also stated that "unfortunately for CENTECH, as CENTECH is aware, the vast majority of the order placed with [CSC] for the . . . materials is non-returnable and non-cancellable, and the remaining items are subject to restocking fees." *Id.* at 241. On September 19, 2018, Iron Bow sued CENTECH in Virginia state court, for failure to "compensate Iron Bow for equipment purchased and services performed pursuant to the Subcontract" for work on the B7000 Activation Project. *Id.* at 189-91. On October 12, 2018, CSC sued Iron Bow for non-payment in Pennsylvania federal court. *See Commc'ns Supply Corp. v. Iron Bow Techs., LLC*, 529 F.Supp.3d 423, 427 (W.D. Pa. 2021).

On October 3, 2018, CENTECH emailed its new subcontractor that "there are materials ('Iron Bow BOMs') that Iron Bow purchased, based on the authorization of the Air Force and CENTECH but have been rejected by the Air Force" and that "[t]hese materials are not on-site." [ECF 103-2] at 197. CENTECH requested that the subcontractor "provide specific information on the determination for each stock item in the Iron Bow purchase, identifying for each stock item what is usable or can be repurposed, based on the approved design." *Id.* Two days later, the subcontractor responded "that the bill of material provided to us [] cannot be repursed based on the 'day2' Corning zone cabling redesign that was approved by Centech project manager [], and it's engineer." *Id.* at 199. Additionally, the new subcontractor sent CENTECH a letter on October 14, 2018, regarding a "Line Item compliancy analysis of the provided schedule of materials, as provided by the Centech engineer, during the proposal process." *Id.* at 210. It stated: "In conclusion the materials in question are not fit for purpose, based on the current contractual requirements[.]" *Id.* at 211. It further stated: "It is my recommendation that the proper owner of the material seek to use these materials on other projects to mitigate their damages." *Id.* One week later, CENTECH emailed this information to the USAF. *Id.* at 208-09. CENTECH added the following:

> Please review and let CENTECH know if the Government (Contracting and Technical teams) concur with [the] findings . . . . Due to the significant amount in question, we would appreciate your/your selected independent third party input, as appropriate. CENTECH will be proceeding with authorizing major purchases, once this Iron Bow BOM repurposing is resolved. As you know, said amount is under litigation.

*Id.* at 209.

On June 5, 2019, CENTECH submitted a certified sponsored claim on behalf of Iron Bow to the CO, seeking payment of $2,009,015.44 plus interest and attorneys' fees, for the materials ordered by Iron Bow. [ECF 102-1] at 238-45. The CO denied the claim on November 6, 2019. *Id.* at 247-48. The CO stated:

> 1. The CENTECH Group, Inc. (CENTECH) was awarded contract FA8732-14-D-0010 under the Air Force's Network Centric Solutions (NETCENTS)-2 contract vehicle. Task order FA8732-14-D-0010-QW02 was issued to CENTECH

by the 30th Contracting Squadron, [VAFB] on 14 Dec 2016. The task order included a requirement for the "Activation of Building 7000" (communication infrastructure) with a budget and funding of $2,995,571.13 (including fixed fee) on a Cost-Plus-Fixed-Fee Contract Line Item (CLIN) for labor and $15M on a Cost Reimbursable CLIN for materials. CENTECH subcontracted with Iron Bow (collectively Team CENTECH) to perform the activation, in accordance with, the Technical Solution for Activation of Bldg 7000 dated 6 June 16, which was proposed in response to the Building 7000 Activation Project Objectives dated 18 Apr 2016.

2.    In performance of the technical solution, a bill of materials (BOM) was submitted to the Government by Team CENTECH for Phase 1 of the activation project[], which was approved by the Government on 30 Nov 17. On 23 January 2018 the labor estimate for installation of the Phase 1 BOM was received by the Government for $6,006,120.15, which was over double the budget for the entire project, the previously proposed estimate for the entire project, and funding for labor for the entire project. In reviewing the labor estimate the Government identified the proposed labor rates were significantly higher than the originally proposed rates. After a time the parties could not resolve their differences so the [CO] affected the cancellation of the BOM. The parties agree that there is a valid Task order FA8732-14-D-0010-QW02. The parties disagree that the cancellation of the BOM was a breach of contract. The claim states that CENTECH is facing potential liability for failing to pay its subcontractor. In its claim CENTECH request approximately two million dollars. The claim is denied. CENTECH has not supported its allegation of breach, nor has it supported its alleged damages.

*Id.* at 247.

CENTECH filed its initial complaint in this Court on November 12, 2019, "to recover . . . the price of materials purchased . . . under a specific Bill of Materials ('BOM') approved in writing by the Air Force." Compl. [ECF 1] at 1. It alleged that the USAF breached the contract when it "cancelled the BOM . . . after CENTECH's subcontractor, Iron Bow . . . purchased and offered the items included in the BOM for delivery." *Id.* CENTECH sought "damages in the amount of $2,009,015.44, plus interest and costs and expenses, as well as legal fees." *Id.* at 9. In an unpublished opinion issued on June 26, 2020, the Court concluded that CENTECH could

maintain a pass-through or sponsored claim on Iron Bow's behalf based on its obligation to pay Iron Bow for the ordered materials. *See* Op. & Order [ECF 22] at 5.[5]

On March 29, 2021, in the related litigation between Iron Bow and CSC, the United States District Court for the Western District of Pennsylvania determined that Iron Bow was liable to CSC for the cost of the materials. *Commc'ns Supply Corp.*, 529 F.Supp.3d at 438. Iron Bow and CSC subsequently settled their case on May 27, 2021, with Iron Bow agreeing to pay CSC $1,900,000. *See* Def's Mot. to Dismiss [ECF 62-1] at 132-33; [ECF 103-2] at 230-33. The settlement agreement provided:

> The Parties agree that Iron Bow shall have thirty (30) days from the execution of this Agreement to take delivery and possession of the [materials] at Iron Bow's sole cost and expense. Iron Bow shall take delivery of the [materials] at CSC's warehouse, at which point all risk of loss shall pass to Iron Bow. Unless otherwise agreed to in writing, if Iron Bow fails to take possession and delivery of the [materials] as required in this Paragraph 4, Iron Bow shall be deemed to have disclaimed any and all rights or title to the [materials] and shall further be deemed to have released any claims it may have against CSC concerning the disposition of the [materials]. At that time, CSC will be free to scrap or otherwise dispose of the [materials] in any way that CSC deems appropriate.

[ECF 103-2] at 231.

After the settlement, Iron Bow took possession of the materials. [ECF 94] ¶ 40. On November 30, 2022, CENTECH submitted a supplemental claim to the CO, seeking additional payments for transportation, storage, and insurance costs relating to the materials, as well as attorneys' fees relating to pre-claim attempts to negotiate a resolution. [ECF 102-1] at 255-62. The CO denied CENTECH's supplemental claim on February 3, 2023. *Id.* at 312-13.

On April 13, 2023, CENTECH filed a second amended complaint—the operative complaint. [ECF 94]. CENTECH asserts three counts in its second amended complaint: (1) breach of contract – failure to pay for the Phase 1 BOM materials ($1,900,000), *id.* ¶¶ 48-62; (2) breach of contract – failure to pay for the transportation, storage, and insurance costs relating to

---

[5] "[U]nder ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act, 28 U.S.C. § 1491, in the event of an alleged government breach or to enforce a claim for equitable adjustment under the Contract Disputes Act of 1978." *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed. Cir. 1983); *Putnam Mills Corp. v. United States*, 479 F.2d 1334 (Ct. Cl. 1973)). However, a narrow exception to the rule exists where: "[a] party in interest whose relationship to the case is that of the ordinary subcontractor may prosecute its claims [] through, and with the consent and cooperation of, the prime, and in the prime's name." *Erickson Air Crane Co. of Washington*, 731 F.2d at 814. Such claims are known as sponsored or pass-through claims. *See Montano Elec. Contractor v. United States*, 114 Fed. Cl. 675, 680 (2014), *aff'd*, 610 F. App'x 987 (Fed. Cir. 2015).

taking possession of the materials ($137,875), *id.* ¶¶ 63-78;[6] and (3) contract administration costs – attorneys' fees relating to pre-claim negotiations ($31,292), *id.* ¶¶ 79-82.[7] On August 8, 2023, the Court denied the government's motion to dismiss CENTECH's second amended complaint, finding that CENTECH had standing to bring its claims and that its claims were adequately stated. *The Centech Grp., Inc. v. United States*, 167 Fed. Cl. 1, 4 (2023). On October 20, 2023, the parties filed cross-motions for summary judgment. [ECFs 102, 103]. The cross-motions are fully briefed, and the Court held oral argument on July 11, 2024.

## II.    STANDARD OF REVIEW

"Summary judgment is appropriate where the evidence demonstrates that there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Agility Def. & Gov't Servs., Inc. v. United States*, 115 Fed. Cl. 247, 250 (2014) (quoting RCFC 56(a)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 405 (2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is genuine if it 'may reasonably be resolved in favor of either party.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "Where the parties have filed cross-motions for summary judgment, the court evaluates each motion on its own merits and makes all reasonable inferences against the party whose motion is under consideration." *Agility Def. & Gov't Servs., Inc.*, 115 Fed. Cl. at 250 (citing *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968-69 (Fed. Cir. 2009)). The court's function is to "determine whether there is a genuine issue for trial" when making a summary judgment determination. *Cheung v. United States*, 146 Fed. Cl. 369, 372 (2019) (citing *Anderson*, 477 U.S. at 249).

Under RCFC 56, "a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file." *Rice Sys., Inc. v. United States*, 62 Fed. Cl. 608, 618 (2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions." *Id.* "[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact," the court shall grant summary judgment to the moving party. *Holland v. United States*, 57 Fed. Cl. 540, 560 (2003) (quoting RCFC 56(c)). "The court will deny both motions if, upon the required analysis, a genuine issue of material fact exists." *IMS Engineers-Architects, P.C. v. United States*, 87 Fed. Cl. 541, 550 (2009) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987)).

---

[6] Since taking possession of the materials from CSC, Iron Bow incurred a $75,000 fee for transportation of the materials to a warehouse, [ECF 102-1] at 264, and Iron Bow continues to pay $2,250.00 per month in storage fees and $2,375.00 per quarter for bailee's insurance, *id.*

[7] CENTECH also asserts that the USAF breached the implied duty of good faith and fair dealing by refusing to permit delivery and installation of the materials and by cancelling the materials order. [ECF 94] ¶¶ 58-59. Because the Court finds that the USAF breached an explicit duty under the contract, the Court does not address this assertion.

## III.    DISCUSSION

The parties dispute whether the USAF breached a contractual duty to reimburse CENTECH for the cost of the Phase 1 BOM and whether, as part of its damages, CENTECH is entitled to recover transportation, storage, and insurance costs. The parties also dispute whether CENTECH is entitled to recover its costs under FAR 31.205-33 for legal services relating to its attempted negotiation of the dispute with the USAF. As explained below, the Court finds that the USAF breached its duty under the contract to reimburse CENTECH for the cost of the Phase 1 BOM and that CENTECH suffered damages due to the breach consisting of the costs of the materials, as well as the post-breach transportation, storage, and insurance. However, there are genuine issues of material fact regarding the reasonableness of CENTECH's mitigation efforts that preclude granting summary judgment on damages. The Court also finds that there are genuine issues of material fact regarding the purpose of the legal services acquired by CENTECH that preclude granting summary judgment on CENTECH's attorneys' fees claim.

### A.    Breach of Contract Claim

CENTECH argues that the government had a contractual duty to pay for the Phase 1 BOM because the government authorized the purchase of the materials and because CENTECH appropriately used CLIN 0090 to request reimbursement. [ECF 102] at 26. CENTECH also argues that the government breached its duty by failing to reimburse it for the cost of the materials. *Id.* at 28. Furthermore, according to CENTECH, "[t]he Government's continued failure to provide direction as to the BOM disposition has resulted in foreseeable costs that stem directly from the Government's breach," specifically transportation, storage, and insurance costs relating to the ongoing storage of the materials. *Id.* at 33. The government counters that it did not have a duty to reimburse CENTECH for the Phase 1 BOM because the "undisputed facts . . . show that CENTECH – which was responsible for choosing the materials and design – did not use the BOM materials on the project or require its new subcontractor to use them; thus, the materials were not 'required to be purchased' 'in support of requirements within th[e] [PWS] . . . .'" [ECF 103] at 33 (alterations in the original). Additionally, the government contends that it had no duty to reimburse CENTECH because CENTECH did not invoice the USAF for the BOM costs, and the materials were not delivered or accepted. *Id.* at 34.[8]

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). "Contract interpretation is a question of law, which may be decided on summary judgment." *SSA Marine, Inc. v. United States*, 77 Fed. Cl. 662, 665 (2007) (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed. Cir. 1993)). Where the "provisions of the [contract] are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and [the court] may not resort to extrinsic

---

[8] The government also asserts that "[i]f CENTECH attempts to ground its claims in assertions that [the USAF] changed the work required under the contract, CENTECH waived such claims by failing to raise them to the CO within the time required by the FAR." [ECF 103] at 33. In fact, CENTECH does not make this argument; instead, it claims that the government's failure to pay for the Phase 1 BOM was a breach of contract. [ECF 94] ¶¶ 48-62.

evidence to interpret them." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).

        1.       The USAF Breached Its Duty to Reimburse CENTECH

The USAF had a duty under the contract to reimburse CENTECH for the cost of the Phase 1 BOM. The relevant task order required CENTECH to "complete the . . . acquisition . . . of the communications infrastructure." [ECF 94-1] at 42. It further stated that the acquisition of "all products and associated peripheral equipment," *id.* at 43, would be based on government-approved final designs, *id.* at 42-43. Additionally, the acquisition of materials was to take place "based on the Government provided schedule and after approval from the government." *Id.* at 43. CLIN 0090 was "utilized to bill for reimbursable materials and equipment." *Id.* at 14. It provided that "[c]osts will be identified and approved as referenced in the PWS" and that CENTECH was "allowed to receive invoice payments for discrete portions of work, including partial deliveries, as soon as completed and found acceptable by the Government." *Id.* The PWS stated that "[r]eimbursable CLINs will apply for materials required to be purchased by the contractor with approval of the government." *Id.* at 37. Thus, under the plain language of the contract, CENTECH was responsible for acquiring materials that were required for the infrastructure project, and the USAF was obligated to reimburse CENTECH for the costs of such materials purchased with USAF approval. *See LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009) ("The threshold question here is whether the plain language of the contract 'supports only one reading . . . .'") (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)).

The USAF breached its duty by failing to reimburse CENTECH for the cost of the government-approved materials. CENTECH developed the Phase 1 BOM in conjunction with the USAF. *See* [ECF 102-1] at 127-28 (meeting minutes dated September 25, 2017, reflecting consideration of the approach by USAF, CENTECH, and Iron Bow); *Id.* at 130 (meeting minutes dated October 4, 2017, reflecting consideration of the "new modernized design" versus the old design and stating that the old "design will not meet the current Base requirements"); *Id.* at 137-39 (meeting minutes dated October 28, 2017, reflecting consideration of the traditional versus modernized design and the government decision to move forward with "the Iron Bow proposed [m]odernized design concept"). CENTECH provided a draft BOM to the USAF, *id.* at 142-46, and reviewed it with them, CENTECH RCFC 30(b)(6) Designee 6/24/2022 Depo. Tr. [ECF 102-1] at 20, 22; USAF PM 1/14/2022 Depo. Tr. [ECF 102-1] at 41-42. Significantly, the USAF approved the BOM as meeting the Phase 1 requirements. [ECF 102-1] at 164 (11/30/2017 memorandum from PM to CO stating that "[t]he BOM meets the government's technical requirements for Phase 1"); *Id.* at 163 (11/30/2017 email from PM to CO stating that his "team is good with the attached BOM for Phase 1 of the Building 7000 Activation project"); PM 1/12/2023 Depo. Tr. [ECF 102-1] at 28 (testifying that "based on [his team's] review of the billed materials proposed . . . [the] billed materials would meet all of [the USAF's] technical requirements for Phase I"). Based on this approval, the CO instructed CENTECH to proceed with acquisition of the Phase 1 BOM. *Id.* at 163 (11/30/2017 email from CO to CENTECH stating that the "attached BOM has been reviewed and is approved for the purchase of materials

for Phase I"). After obtaining approval from the USAF, CENTECH, through its subcontractor Iron Bow, acquired the Phase 1 materials from CSC. [ECF 102-1] at 171-72.

After ordering the Phase 1 BOM from Iron Bow, CENTECH submitted an invoice for the materials to the USAF seeking reimbursement. [ECF 102-1] at 207. In response, the USAF declined to reimburse CENTECH the full cost of the Phase 1 BOM and instructed CENTECH to cancel the order because "the material [did] not meet the Government's requirements." [ECF 102-1] at 236. The USAF also told CENTECH that while "the delivered shipment of materials for $140,770.20 [could] be invoiced and reimbursed," those "materials not delivered to the Government [could not] be reimbursed." *Id.* Because the USAF had a duty to reimburse CENTECH for the *full* cost of the approved Phase 1 BOM, the USAF's declining to reimburse CENTECH constitutes a breach of its payment obligations under the contract.

2.    The Government's Arguments

Before analyzing CENTECH's breach-related damages, the Court turns to the government's arguments in its cross-motion for summary judgment. The government argues that CENTECH cannot establish that the USAF had a duty to reimburse CENTECH for the materials "when (1) the materials were not required for the Building 7000 Activation Project, (2) CENTECH did not invoice [the USAF] for these costs, and (3) the materials were neither delivered nor accepted." [ECF 103] at 28. The Court disagrees.

*i.    The Phase 1 BOM was Required for the Project*

First, at the time of CENTECH's acquisition of the Phase 1 BOM from Iron Bow, the materials were required for the project. CLIN 0090 states that "[c]osts will be identified and approved as referenced in the PWS." [ECF 94-1] at 14. The PWS states that "[r]eimbursable CLINS will apply for materials required to be purchased by the contractor with approval of the government in support of requirements within this PWS." *Id.* at 37. At the time of CENTECH's acquisition of the Phase 1 BOM from Iron Bow, the materials had been approved by the government as meeting the project's requirements. Critically, the PM communicated to the CO that "[t]he BOM meets the government's technical requirements for Phase 1." [ECF 102-1] at 164. The CO then told CENTECH that the BOM was "approved for the purchase of materials for Phase I." *Id.* at 163. Thus, at that time, CENTECH was required to purchase the Phase 1 BOM in support of the project requirements.

The government argues that the materials were not required because CENTECH ultimately "concluded that they were not and used other materials instead." Def.'s Resp. [ECF 105-1] at 35. To demonstrate that CENTECH determined that the materials in the Phase 1 BOM were not required, the government relies on actions taken by CENTECH beginning in March 2018, such as hiring a consultant to review the Phase 1 BOM and soliciting proposals from other subcontractors to replace Iron Bow. *See id.* at 33-34. The government posits that "after CENTECH removed Iron Bow from the B7000 Activation Project, the new subcontractor, [], found the materials to be non-compliant and ordered other materials." *Id.* at 34. These actions, however, do not demonstrate that the materials were not required at the time of approval. These

actions occurred after the USAF approved the Phase 1 BOM for purchase, [ECF 94-1] at 92; after the USAF authorized CENTECH to proceed with installation of a portion of the materials, [ECF 102-1] at 175; and after the USAF paused the installation, [ECF 94-1] at 112. There is no evidence that the Phase 1 materials failed to meet the government's requirements at the time of approval by the USAF and acquisition by CENTECH.

Furthermore, while CENTECH was certainly obligated under the task order to "[p]roduce the final designs . . . to include an updated BOM," [ECF 94-1] at 43, the USAF retained and exercised final design approval authority, *see id.* at 42-44 (referencing "Government approved final designs"); *id.* at 43 (requiring CENTECH to obtain all products and equipment "after approval from the government"); *id.* at 37 (stating that reimbursement will apply to materials purchased "with approval of the government"). As explained above, CENTECH provided the Phase 1 BOM to the USAF and obtained approval to purchase the materials. CENTECH then requested and received authorization from the USAF to proceed with installation. [ECF 102-1] at 175. The USAF stopped installation only after it raised concerns regarding the labor estimates. *See id.* at 186. In addition, after CENTECH removed Iron Bow as a subcontractor, CENTECH sent the USAF an invoice for the Phase 1 BOM and "urge[d] the [USAF] to consider the use of the materials covered by the invoice, *based on the appropriate revised design*." *Id.* at 207 (emphasis added). In response, the USAF "request[ed] that CENTECH cancel the order . . . as it ha[d] become evident the material d[id] not meet the Government's requirements." *Id.* at 236. The USAF also stated that "[i]f there [were] items that [could] be utilized for the Bldg 7000 project on this task order [it] request[ed] CENTECH provide a list to the Government for approval prior to shipment." *Id.* Based on this direction, CENTECH requested that its new subcontractor "provide specific information on the determination for each stock item in the Iron Bow purchase, identifying for each stock item what [was] usable or [could] be repurposed, *based on the approved design*." [ECF 103-2] at 197 (emphasis added). After the new subcontractor informed CENTECH that the materials could not be reused "based on the current contractual requirements," *id.* at 211, CENTECH shared this information with the USAF and requested the USAF's concurrence with the new subcontractor's findings prior to proceeding with the revised design. *Id.* at 208-09. Thus, even after the USAF stopped installation of the Phase 1 BOM and instructed CENTECH to cancel it, the USAF continued to exercise final approval authority over the revised design and related BOM, and CENTECH continued to perform under such authority. In sum, regardless of whether the materials were ultimately used by CENTECH to complete the project, the materials were required for the project because the USAF approved the purchase of the materials as meeting the USAF's technical requirements.

*ii.      CENTECH's Failure to Comply with the Invoicing Requirements Was Not a Material Breach*

Next, CENTECH's failure to comply with the contract's invoicing requirements does not excuse the USAF from its duty to reimburse CENTECH for the materials that the USAF approved for purchase. "Under the doctrine of prior material breach, 'when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach.'" *K-Con Bldg. Sys., Inc. v. United States*, 131 Fed. Cl. 275, 332 (2017) (quoting *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1380

(Fed. Cir. 2004)). The doctrine is "based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties . . . if there has already been an uncured material failure of performance by the other party." *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004) (quoting Restatement (Second) of Contracts § 237b cmt. b (Am. L. Inst. 1981)). However, "only a sufficiently material breach can justify the Government's subsequent breach." *First Annapolis Bancorp, Inc. v. United States*, 75 Fed. Cl. 280, 292 (2007) (citing *Christopher Vill., L.P.*, 360 F.3d at 1335). "Whether a breach is material is a mixed question of law and fact." *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1369 (Fed. Cir. 2005) (citing *Gilbert v. Dep't of Justice*, 334 F.3d 1065, 1071-72 (Fed. Cir. 2003)). "A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." *Hometown Fin., Inc.*, 409 F.3d at 1370 (quoting *Thomas v. Dep't of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997)). "The materiality of a breach is determined in light of the totality of events and circumstances." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) (citing the Restatement (Second) § 241 cmt. a (Am. L. Inst. 1981)). "This flexible approach examines 'the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties.'" *First Annapolis Bancorp, Inc.*, 75 Fed. Cl. at 292 (quoting *Stone Forest Indus., Inc.*, 973 F.2d at 1557).

Here, the government argues that it did not have a duty to reimburse CENTECH for the cost of the Phase 1 BOM because "CENTECH did not submit . . ., its *own* invoice . . . for its subcontractor Iron Bow's costs . . . nor did it submit any invoice through WAWF," and, therefore, was in breach of contract.[9] [ECF 105-1] at 32. However, CENTECH's breach is not sufficiently material to justify the USAF's failure to reimburse CENTECH for the cost of the materials that the USAF approved for purchase. The task order required CENTECH "to complete the [], *acquisition*, . . . of the communications infrastructure supporting the renovation of B7000 on [VAFB]," [ECF 94-1] at 42 (emphasis added), and entitled CENTECH to reimbursement from the USAF "for materials required to be purchased by [CENTECH] with approval of the government," *id.* at 37. In seeking reimbursement, instead of submitting its invoice through WAWF as required by the contract, CENTECH submitted the invoice to the USAF CO via email. [ECF 102-1] at 207. CENTECH noted in its email that the invoice had "not been submitted to . . . WAWF." *Id.* Contrary to the government's assertion that CENTECH did not submit its *own* invoice, the attached invoice was on CENTECH letterhead, *id.* at 210-11, and it reflected Iron Bow's costs with CENTECH's administrative and handling charges, *id.* at 211. Therefore, CENTECH did submit its own invoice to the USAF. Further, the fact that CENTECH emailed the invoice rather than submit it through WAWF is not a matter of vital importance, as this requirement does not go to the essence of the contract. *See Hometown Fin., Inc.*, 409 F.3d at

---

[9] Specifically, the government argues that CENTECH failed to comply with the requirements of FAR 52.216-7, Allowable Cost and Payment (JUN 2013), and DFARS 252.232-7003(b), Electronic Submission of Payment Requests and Receiving Reports (JUN 2012), both of which were contained in the contract. *See* [ECF 103] at 35-36; [ECF 105-1] at 32; [ECF 103-2] at 381, 394. CENTECH concedes that it did not comply with the invoicing requirements and instead argues that such compliance would have been futile and that the requirements were not material. *See* Pl.'s Opp. [ECF 104] at 13-14; Pl.'s Reply [ECF 109] at 10-11. Because the Court finds that CENTECH's failure to comply with the contract's invoicing requirements is not a material breach that justifies the USAF's failure to reimburse CENTECH, the Court does not analyze the specific invoicing requirements under these clauses.

1369.

In reaching this conclusion, the Court is guided by the factors in section 241 of the Restatement of Contracts for determining whether a party's breach is material. When considering whether CENTECH's breach—its failure to submit its invoice through the WAWF—was material, section 241 counsels that the Court consider the following:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981), *quoted in First Annapolis Bancorp, Inc.*, 75 Fed. Cl. at 292. Each of these factors supports the conclusion that CENTECH's failure to comply with the invoicing requirements is not a material breach. *See Restatement (Second) of Contracts § 241 cmt. a* (Am. L. Inst. 1981) (explaining that these factors are "to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances"). First, while the USAF has thus far been deprived of the benefit of receiving the invoice through the WAWF, CENTECH could still submit its invoice in the prescribed manner. Next, if CENTECH's breach were deemed sufficiently material such that it justified the USAF's failure to reimburse CENTECH for the materials, CENTECH would forfeit its right to reimbursement for materials the government approved for purchase. Such an outcome would not "further the purpose of securing for [the USAF and CENTECH their respective] expectation of [the] exchange of performances" under the contract. *First Annapolis Bancorp., Inc.*, 75 Fed. Cl. at 292 (quoting Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981). The USAF had a contractual obligation to reimburse CENTECH for the materials that the USAF approved for purchase, and CENTECH's noncompliance with the invoicing requirements did not occur until after it made the purchase. *See* Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981) (explaining that "a failure is less likely to be regarded as material if it occurs late, after substantial preparation or performance, and more likely to be regarded as material if it occurs early, before such reliance"). Lastly, CENTECH has not exhibited an unwillingness to cure its failure. CENTECH submitted

the invoice via email for advance "review/comments" and explicitly acknowledged in the email that the invoice had not been submitted through the WAWF. While this approach does not satisfy the written contractual requirement that CENTECH submit its invoices through the WAWF, CENTECH's having sought the USAF's advance approval of the invoice before submitting it through WAWF certainly comports with the standards of good faith and fair dealing and demonstrates its willingness to remedy this failure after obtaining such approval. *See Hometown Fin., Inc. v. United States*, 60 Fed. Cl. 513, 522 (2004), *aff'd*, 409 F.3d 1360 (Fed. Cir. 2005) (finding no prior material breach by the plaintiff where there was no evidence of willful misconduct or fraud, and the facts show that the plaintiff would remedy the noncompliance if raised by the government).

    *iii.*    *The USAF Prevented CENTECH From Meeting the Delivery and Acceptance Requirements*

    Finally, the USAF cannot avoid its obligation to reimburse CENTECH for the approved materials on the grounds that the materials were not delivered or accepted. Under the doctrine of prevention, "[i]t is well-settled that a party to a contract cannot escape or minimize its liability on the ground that the other party has failed to perform a condition precedent to the establishment of such liability, where the breaching party has caused that failure." *Park Props. Assocs., L.P. v. United States*, 82 Fed. Cl. 162, 170 (2008). Stated differently, "[w]here a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform." *Id.* (quoting 13 Richard A. Lord, Williston on Contracts § 39:3 (4th ed. 2000)).

    The government argues that the USAF did not have a duty to pay CENTECH because the materials were neither delivered nor accepted. [ECF 103] at 36. CLIN 0090 of the task order provided that CENTECH is "allowed to receive invoice payments for discrete portions of work, including partial deliveries, as soon as completed and found acceptable by the Government." [ECF 94-1] at 14. However, the task order also required CENTECH to "obtain and manage logistics" for the materials "*based on the Government provided schedule and after approval from the government*." *Id.* at 43 (emphasis added). Thus, while delivery of the materials to VAFB by CENTECH and acceptance of such materials by the USAF are perhaps conditions precedent to CENTECH receiving payment, CENTECH could only achieve such conditions based on a USAF-provided schedule and with USAF approval. In fact, CENTECH obtained approval from USAF to purchase all the Phase 1 materials, [ECF 94-1] at 92, and to install a portion of them, [ECF 102-1] at 175. The USAF agreed to reimburse CENTECH for the portion of the materials that it had delivered to VAFB for installation. [ECF 102-1] at 236 (the CO instructing that "the delivered shipment of materials for $140,770.20 can be invoiced and reimbursed"). However, before CENTECH could complete delivery of the materials, the USAF paused the installation, [ECF 94-1] at 112, and subsequently instructed CENTECH to cancel the BOM, [ECF 102-1] at 236. These actions by the USAF made it impracticable for CENTECH to deliver the remaining materials to VAFB and to seek acceptance by the USAF. Because the USAF hindered CENTECH from achieving the conditions precedent to receiving payment from the USAF for the approved materials, the USAF cannot be relieved of its obligation to reimburse CENTECH based on CENTECH's failure to make delivery or obtain acceptance. *See Park Props. Assocs.,*

-16-

*L.P.*, 82 Fed. Cl. at 171-73 (collecting cases).

3.    CENTECH Suffered Damages as a Result of the Breach

CENTECH suffered damages due to the USAF's approval of the Phase 1 BOM for acquisition by CENTECH and subsequent failure to reimburse CENTECH for the entire cost of such materials. "The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1562). "[T]he general principle is that all losses, however described, are recoverable." *Id.* (quoting Restatement (Second) of Contracts § 347 cmt. c (Am. L. Inst. 1981)). "Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Ind. Mich. Power Co.*, 422 F.3d at 1373 (citing *Energy Cap. Corp. v. United States,* 302 F.3d 1314, 1320 (Fed. Cir. 2002)).[10] The non-breaching party must establish entitlement to damages by a preponderance of the evidence. *Duke Energy Progress, Inc. v. United States*, 135 Fed. Cl. 279, 286 (2017).

CENTECH suffered damages consisting of the cost of the government-approved materials and the related transportation, storage, and insurance costs. First, CENTECH's damages for the cost of the materials were reasonably foreseeable by the USAF at the time it contracted with CENTECH because the USAF hired CENTECH to acquire materials for the project and agreed to reimburse CENTECH for materials purchased with the USAF's approval. *See* [ECF 94-1] at 42 (stating that the USAF contracted with CENTECH "to complete the . . . acquisition, . . . of the communications infrastructure"); *id.* at 43 (stating that "after approval from the government, [CENTECH was required to] obtain . . . all products . . . to successfully implement all approved designs"); *id.* at 14 (CLIN 0090 was to "be utilized to bill for reimbursable materials"); *id.* at 37 (stating that "[r]eimbursable CLINs will apply for materials required to be purchased by the contractor with approval of the government"); *id.* at 92-93 (11/30/2017 email from the PM to the CO recommending that CENTECH purchase the Phase 1 BOM "as soon as possible"); *id.* at 92 (11/30/2017 email from the CO to CENTECH approving the Phase 1 BOM for purchase). Next, the USAF's breach was the direct cause of CENTECH's damages. *See Portland Gen. Elec. Co.*, 107 Fed. Cl. at 642 (stating that "[t]he 'but for' test finds the breaching party liable for damages that it directly caused"); *see also San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563 (stating that "[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered"). But for the USAF's approval of the materials for purchase by CENTECH and its subsequent failure to reimburse CENTECH for the cost of the materials, CENTECH would not have ordered the materials and incurred liability to

---

[10] Causation is a question of fact. *Bluebonnet Sav. Bank F.S.B. v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001). The Court determines causation using the "but for" test or the "substantial factor" test. *Portland Gen. Elec. Co. v. United States*, 107 Fed. Cl. 633, 641 (2012). "[T]he selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007). However, the Federal Circuit has stated that the "substantial cause test is not preferred." *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1272 (Fed. Cir. 2008). Here, the Court applies the "but for" test, but the result would be the same if the Court were to apply the "substantial factor" test.

Iron Bow for the cost of the materials. *See* [ECF 94-1] at 92 (11/30/2017 email from the CO to CENTECH approving the Phase 1 BOM for purchase); *id.* at 100-03 (12/14/2017 email from CENTECH to Iron Bow authorizing the purchase of the Phase 1 BOM); *id.* at 105-07 (12/14/2017 purchase order issued by Iron Bow to CSC for the Phase 1 BOM); [ECF 103-2] at 126-27 (4/18/2018 invoice issued by Iron Bow to CENTECH for the materials); *id.* at 189-90 (9/19/2018 complaint filed by Iron Bow against CENTECH in Virginia state court for failure to reimburse Iron Bow for Phase 1 BOM). Lastly, CENTECH has established its damages with reasonable certainty. As evidence of the cost of the Phase 1 BOM, CENTECH produced Iron Bow's invoice to CENTECH for the Phase 1 BOM, *see* [ECF 103-2] at 126-27 (4/18/2018 invoice issued by Iron Bow to CENTECH for $1,933,533.11, the cost of the Phase 1 BOM), as well as CENTECH's invoice to the USAF based on Iron Bow's invoice, *id.* at 135-37 (5/21/2018 email from CENTECH to USAF explaining why CENTECH sought $2,009,015.44 when Iron Bow's invoice for the materials was $1,933,533.11). Additionally, the cost of the Phase 1 BOM was further confirmed by Iron Bow's payment to CSC of $1,900,000.00 in full satisfaction of its liability for the materials after it was determined that the materials were non-cancellable. [ECF 102-1] at 250.[11] Therefore, CENTECH's damages for the cost of materials were reasonably foreseeable, would not have occurred but-for the government's breach, and are calculable with reasonable certainty.

CENTECH also suffered damages for transportation, storage, and insurance costs relating to its post-breach handling of the materials. The cost of material handling was reasonably foreseeable by the USAF at the time of contracting. The task order stated that CENTECH would "manage logistics for all products and associated peripheral equipment required to successfully implement all approved designs." [ECF 94-1] at 43. The task order also contained a "just-in-time" provision, which was included as a means of remedying the lack of on-site storage at VAFB. *See* CO 12/16/2021 Depo. Tr. [ECF 102-1] at 161 (explaining that the USAF included the "just-in-time" provision because there was no warehouse space at VAFB that could be used to take receipt of the BOM materials); USAF Lieutenant Colonel Depo. Tr. [ECF 102-1] at 125 (explaining that the USAF included the just-in-time provision in order to "minimize [] storage requirements" due to the "lack of storage on the base"). The task order also stated that the acquisition and delivery of the materials would be based on "the Government provided schedule" and would occur after approval by the government. [ECF 94-1] at 43. Therefore, it was reasonably foreseeable that CENTECH would incur transportation, storage, and insurance costs related to the materials from the time the USAF approved the materials for acquisition by CENTECH until the time the USAF scheduled delivery and installation. Next, the USAF's failure to reimburse CENTECH for the materials directly caused CENTECH to incur these handling costs. Specifically, but for the USAF's approval of the materials for purchase by CENTECH and subsequent failure to reimburse CENTECH for the cost of the materials, the materials would not have been acquired by CENTECH and the costs to handle the materials would not have been incurred. *See San Carlos Irrigation & Drainage Dist.,* 111 F.3d at 1563.

---

[11] The government does not challenge the cost of the Phase 1 BOM materials. Additionally, the USAF previously agreed to pay CENTECH based on the invoice it provided to the USAF for that portion of the Phase 1 BOM materials that was delivered. *See* [ECF 102-1] at 236 (6/1/2018 memorandum from the CO to CENTECH stating that the USAF would reimburse it for the delivered portion of the materials based on CENTECH's 5/21/2018 invoice).

Finally, like the cost of the materials, the costs for the transportation, monthly storage, and quarterly insurance are reasonably certain, as they are reflected in invoices submitted by the logistics vendor. [ECF 94-1] at 143. Accordingly, CENTECH's damages for transportation, storage, and insurance costs were reasonably foreseeable, would not have occurred but-for the government's breach, and are calculable with reasonable certainty.

The government nevertheless argues that, under *Ramsey v. United States*, the transportation, storage, and insurance costs fail to satisfy the causation requirement because such costs "relate to 'independent and collateral undertakings' and are too 'remote to be taken into consideration as a part of the damages occasioned by the [] breach.'" [ECF 103] at 43 (quoting *Ramsey v. United States*, 121 Ct. Cl. 426, 435 (1951)). It contends that, under the settlement agreement between Iron Bow and CSC, "Iron Bow was free to choose whether to take possession of the materials" and that it only took possession of the materials because it was concerned that the government would request delivery of the materials after it paid for them. [ECF 103] at 43.[12] Because this is an "independent concern," the government asserts that CENTECH cannot demonstrate that its money damages were directly caused by the USAF's breach. *Id.* at 44 (internal quotation marks omitted). The Court is not persuaded by the government's reasoning. In *Ramsey*, the court determined that the plaintiff's lost profits from its "over-all business activities, because of its shortage of capital allegedly occasioned by the Government's failure to pay the contract amounts when due, . . . [were] collateral undertakings, which . . . [were] too remote to be classified as a natural result of the Government's delay in payment." *Ramsey*, 121 Ct. Cl. at 434. Here, the transportation, storage, and insurance costs are not collateral undertakings but are instead a natural result of the USAF's failure to make payment and provide delivery instructions for the government-approved materials. *See Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005) (stating that "[t]he existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach" but that the causal connection between the breach and the damages must be "definitely established").

    4.    Genuine Issues of Material Fact Regarding CENTECH's Mitigation Efforts Preclude Summary Judgment on Damages

Having determined that CENTECH suffered damages based on the cost of the Phase 1 BOM and the related costs for transportation, storage, and insurance, the Court considers whether CENTECH took reasonable steps to mitigate its damages. The non-breaching party has an obligation to mitigate its damages. *See Ind. Mich. Power Co.*, 422 F.3d at 1375 (noting that "[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise") (quoting Restatement (Second) Contracts § 350 cmt. b (Am. L. Inst. 1981) (alteration in original)). However, the non-breaching party need

---

[12] Under the settlement agreement between Iron Bow and CSC, Iron Bow had thirty days "to take delivery and possession of the [CSC] Products at Iron Bow's sole cost and expense." [ECF 102-1] at 251. Further, "if Iron Bow fail[ed] to take possession and delivery of the [CSC] Products," then Iron Bow was "deemed to have disclaimed any and all rights or title to the [CSC] Products" and CSC was "free to scrap or otherwise dispose of the [CSC] Products in any way that CSC deems appropriate." *Id.*

"only make those efforts that are fair and reasonable under the circumstances." *Robinson v. United States,* 305 F.3d 1330, 1333 (Fed. Cir. 2002). If the breaching party seeks to reduce the amount of claimed damages, it "bears the burden of establishing that [the non-breaching party's] damages claims should be reduced or denied." *Duke Energy Progress, Inc.*, 135 Fed. Cl. at 287 (citing *Home Sav. of Am., F.S.B. v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005)).

Here, genuine issues of material fact preclude granting summary judgment on whether CENTECH undertook fair and reasonable mitigation efforts. In response to CENTECH's motion for summary judgment, the government argues that CENTECH's efforts were not reasonable because Iron Bow "withdrew" from a deal with another contractor—a deal that would have utilized the materials on another project and refunded Iron Bow the money it spent on the materials. [ECF 105-1] at 46. Therefore, the government contends that "[s]ummary judgment on CENTECH's damages claim cannot be granted without review – at trial – of whether the claim is barred, in whole or in part, by CENTECH's and Iron Bow's failure to mitigate the alleged damages." *Id.* CENTECH counters that no such deal existed and there existed only "the kernel of a deal," who's terms had not been finalized. [ECF 109] at 20. CENTECH also suggests that Iron Bow "attempted to solicit buyers for the BOM [and] looked into salvaging the BOM, and [that] the results have been futile." *Id.* at 19. Based on the current record, the Court cannot determine whether CENTECH's mitigation efforts were fair and reasonable. There is evidence that supports the government's contention that there was an opportunity to use the materials on another project, that the relevant parties were close to an agreement, and that Iron Bow unreasonably withdrew from the negotiations. [ECF 105-1] at 140-52. Additionally, CENTECH's statement that Iron Bow attempted to salvage or to solicit buyers for the materials is unsupported because the language CENTECH cites for this proposition is taken from a question asked of Iron Bow's RCFC 30(b)(6) designee, not the designee's answer to the question. *See* Iron Bow RCFC 30(b)(6) Designee 6/23/2022 Depo. Tr. [ECF 102-1] at 200 ("Q And then the final sentence of that paragraph reads, Please note that CSC has no ability to resell the [Phase 1 BOM] to another customer or to otherwise obtain any salvage value for the products at this point. Do you see that? A Yes."). Because there are genuine issues of material fact regarding the reasonableness of CENTECH's mitigation efforts, neither party is entitled to summary judgment on damages.

### B.    Attorneys' Fees Claim

CENTECH argues that, under FAR 31.205-33, it is entitled to be reimbursed its reasonable attorneys' fees for efforts made between September 2018 and July 2019 "to globally resolve the BOM dispute." [ECF 102] at 34. According to CENTECH, "[w]hile such efforts ultimately failed, . . . these attorneys' fees are reasonable and allocable . . . [because they] were primarily directed at negotiating a resolution of the matter." *Id.* CENTECH further states that "[a]ny fees for time expended towards a litigation posture have not been claimed." *Id.* The government counters that CENTECH has no right to recover attorneys' fees in its sponsored claim. [ECF 103] at 44. The government contends that CENTECH cannot assert a claim for attorneys' fees under FAR 31.205-33 because the clause "allows recovery of 'services acquired by . . . subcontractors in order to enhance their legal, economic, financial, or technical positions.'" *Id.* (quoting FAR 31.205-33(a)). According to the government, "Iron Bow was not

CENTECH's subcontractor on the Building 7000 Activation Project at the time that Iron Bow incurred the claimed attorney fees, which began to accrue on September 5, 2018," and, therefore, Iron Bow's attorneys' fees are not allowable. *Id.*

FAR 31.205-33 provides that "[c]osts of professional and consultant services are allowable . . . when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government." FAR 31.205-33(b). "Professional and consultant services" are defined as:

> [T]hose services rendered by persons who are members of a particular profession or possess a special skill and who are not officers or employees of the contractor. Examples include those services acquired by contractors or subcontractors in order to enhance their legal, economic, financial, or technical positions. Professional and consultant services are generally acquired to obtain information, advice, opinions, alternatives, conclusions, recommendations, training, or direct assistance, such as studies, analyses, evaluations, liaison with Government officials, or other forms of representation.

FAR 31.205-33(a). However, under FAR 31.205-47(f), costs are unallowable if incurred in connection with "the prosecution of claims or appeals against the Federal Government." 31.205-47(f)(1); *see Bill Strong Enters., Inc. v. Shannon*, 49 F.3d 1541, 1549 (Fed. Cir. 1995) (holding that "a legal, accounting, or consulting cost incurred in connection with the prosecution of a CDA claim or an appeal against the Government is *per se* unallowable"), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995). To be allowable, costs incurred in connection with the performance or administration of a contract must provide a "[b]enefit to the contract purpose." *Id.* "In classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim . . . courts should examine the objective reason why the contractor incurred the cost." *Id.* "If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost allowable under FAR 31.205-33, even if negotiation eventually fails and a CDA claim is later submitted." *Id.* "On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205-33." *Id.*

The fact that Iron Bow was not an active subcontractor at the time it incurred the attorneys' fees does not preclude recovery of the costs under FAR 31.205-33. Rather, the relevant distinction for determining allowability is whether the claimed cost is "a contract administration cost or a cost incidental to the prosecution of a claim." *Tip Top Const., Inc. v. Donahoe*, 695 F.3d 1276, 1283 (Fed. Cir. 2012) (citing *Bill Strong Enters., Inc.*, 49 F.3d at 1549-50). On this issue, there are genuine issues of material fact as to the objective reason why CENTECH incurred the cost—namely whether the costs were incurred for the purpose of furthering negotiations with the USAF, prosecuting its CDA claim, or prosecuting or defending the separate lawsuits involving CENTECH, Iron Bow, and CSC. In support of its claim,

CENTECH provides copies of invoices from the law firm engaged by Iron Bow. [ECF 102-1] at 287-310. The relevant legal services were performed from September 5, 2018, *id.* at 287, through July 19, 2019, *id.* at 306. CENTECH submitted its certified sponsored claim to the CO on behalf of Iron Bow on June 5, 2019. [ECF 102-1] at 238-45. Therefore, the legal services were largely rendered prior to the date that CENTECH submitted its claim. Nevertheless, the description of the services does not indicate that the services were incurred for the benefit of the contract or as a means of materially furthering negotiations with the USAF. *See Bill Strong Enters., Inc.*, 49 F.3d at 1550. Rather, the legal services are generally described as involving discussions and teleconferences between the law firm's attorneys, Iron Bow's counsel, and CENTECH's counsel relating to litigation and settlement strategies. *See, e.g.*, [ECF 102-1] at 296 ("Review and analyze BOM; Conference . . . regarding litigation and settlement strategy; Conference with client re same"); *id.* at 297 ("Emails and telcon with Centech counsel re USAF issue; Send documents to same and review in advance; Telcon with client re same; Conference with legal team re same"). It is therefore unclear whether the legal services related to negotiations or exchanges of information with the USAF to resolve the dispute over the Phase 1 BOM materials. Consequently, neither CENTECH nor the government is entitled to summary judgment on this issue. *See P.R. Burke Corp. v. United States*, 58 Fed. Cl. 549, 559 (2003) (denying summary judgment because genuine issues of material fact exist as to whether the consultant services ultimately provided any benefit to the government); *SUFI Network Servs., Inc. v. United States*, 105 Fed. Cl. 184, 194 (2012) (finding plaintiff entitled to attorneys' fees where "the factual record is filled with instances of negotiation and information exchange at the administrative level").

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** CENTECH's cross-motion for summary judgment. [ECF 102]. The Court **GRANTS** CENTECH's motion on Counts I and II of its second amended complaint [ECF 94] with respect to liability for breach of contract and **DENIES** its motion on Counts I and II with respect to damages. The Court **DENIES** CENTECH's motion on Count III. The Court **DENIES** the government's cross-motion for summary judgment. [ECF 103]. The parties **SHALL CONFER AND FILE** a status report **on or before March 21, 2025**, proposing a schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge